33164, 33165.  WHEELER *v*. WHEELER, executor;
and *vice versa*.

DECIDED DECEMBER 5, 1950.  REHEARING DENIED DECEMBER 20, 1950.

*Pittman, Hodge & Kinney,* for plaintiff in error.
*Mitchell & Mitchell,* contra.

MacIntyre, P.J. (After stating the foregoing facts.) ■ "The right to offer a will for probate shall belong to the executor, if one is named." Code, § 113-614. "The executor shall offer the will for probate as soon as practicable after the death of the testator, and shall qualify . . within 12 months after the same is admitted to record." § 113-615. "As soon as the probate of the will is made in common form, in vacation, and before it is admitted to record, and before qualification, the executor named therein may exercise all the powers of a temporary administrator as to the collecting and preserving of the estate." § 113-1501. "An executor who has either formally or by operation of law, voluntarily renounced his trust, may not afterwards relieve himself from the effect of renunciation." § 113-1228.

It seems to us that the part of the second amendment which states that J. Roy Wheeler, having renounced his nomination as one of the executors named in the will of Mrs. Rebecca Wheeler, and the part of the third amendment which states that the will of Mrs. Rebecca Wheeler had been probated in common form, and that, since the filing of the first amendment on January 18, 1950 (the same day on which the second and third amendments were filed), J. Roy Wheeler had renounced his nomi-

nation as executor of the estate of Mrs. Rebecca Wheeler, pleads nothing but facts as they really existed or by legal presumption are deemed to exist. The act of renunciation as pleaded in the second and third amendments is to be understood as intending a real renunciation, something that the law would recognize as such. *Draper, Moore & Co.* v. *Macon Dry Goods Co.*, 103 *Ga.* 661, 665 (30 S. E. 566). Having alleged the fact of the renunciation, "the plaintiff is not obliged to spread out his proof upon the record. If the rule was otherwise, the defendant by his demurrer, might cut off the plaintiff's testimony, however sufficient it might be to make out his case." *Gilmer* v. *Allen,* 9 *Ga.* 208, 209. And as an illegal act is not to be presumed, it is not to be presumed that the renunciation was one which the law would not recognize as such on account of some illegal act of J. Roy Wheeler or the ordinary, the presumption being that neither Wheeler nor the ordinary did any illegal act in effecting the renunciation.

It might be noted that "The legal presumption is, that the ordinary performed his duty in regard to the protection of the assets of the state [estate?] before accepting the renunciation of one of the executors nominated in the will." *Deupree* v. *Deupree,* 45 *Ga.* 414. The executor is not required to file his renunciation with the ordinary in term time. Nor does the ordinary have to act upon the matter in term time. It is otherwise when the executor has qualified and functioned and wishes to resign or asks dismissal because he has duly administered the estate as directed by the will and the law. The law does not require an executor to qualify at once upon the probate of the will in common form. It nowhere appears on the face of the petition that J. Roy Wheeler ever qualified as executor of his mother's will. "A renunciation is an act whereby a person, named in a will as executor, declines to take on himself the burthen of that office. The act is, therefore, predicated of an existing office. It presupposes the existence of the will. If no will has been made, there is no executorship to renounce. Nor until it is shown that there is a will, can it appear that there is a renunciable executorship." In the matter of the application of John S. Maxwell for letters, etc., 3 N. J. Equity Reports, 611, 614 (2 H. W. Green). In the probate of the will in common form,

the executors, J. Roy and Harley Wheeler, were exercising their right. Code, §§ 113-614, 113-615, supra. This showed that there was a will, and for the first time it appeared that there was an executorship which Roy Wheeler could renounce, and he renounced the nomination as executor of the will at not more than ten days from the time of the probation of the will in common form, for, under the allegations of the petition, Mrs. Wheeler died on the 8th of January, 1950, and the will was probated some time between the 8th of January, 1950, and the 18th day of the same month; and on the 18th of January, 1950, J. Roy Wheeler, according to his allegation, renounced the nomination as executor under the said will. Thus it does not appear on the face of the petition that the renunciation was made at an illegal time.

Notwithstanding the error in overruling the demurrer to the petition as first amended, making Roy and Harley Wheeler as coexecutors parties plaintiff (Williams v. McHugh, 17 Ga. App. 59, 86 S. E. 272; MacDougall v. National Bank of Columbus, 150 Ga. 579, 104 S. E. 630), when thereafter during the trial of the case on the same day the plaintiff voluntarily, by his second and third amendments, struck the objectionable matter contained in the first amendment to the petition, in which the defendant, in his capacity as executor, had been made a party plaintiff, the defect was cured, and the petition as so amended was not subject to such demurrer. See Atlantic Coast Line R. Co. v. Mc-Elmurray Bros., 14 Ga. App. 196(1) (80 S. E. 680).

Applying the rule that a demurrer to a plea (or petition) admits that the facts set out therein can be legally proved unless the contrary appears on the face of the record, the court did not err in allowing the second and third amendments.

■ An amendment to paragraph 8 of the petition was allowed on December 16, 1949. The petition as thus amended alleged that the plaintiff, Mrs. Rebecca Wheeler, had paid and become liable for certain bills totaling $2843.75 as necessary expenses as a result of the injuries in question. These itemized bills, for which the defendant advanced the money, as well as a note for the same amount, dated September 20, 1949, signed by Harley Wheeler as his mother's authorized agent, were introduced in evidence. Harley Wheeler testified that these bills or items

were made to Roy Wheeler, and he assumed the responsibility of paying these expenses; that someone had to pay them; and that he thought Roy Wheeler probably felt responsible and went ahead and paid them. In this connection Harley Wheeler testified further: "She [Mrs. Wheeler] wanted Roy to be reimbursed. As to whether she wanted to sue Roy, then get the money and pay it back to Roy—well, yes, she expected Roy to be reimbursed for his expense. As to whether she was going to sue Roy and then pay Roy—well, yes, she expected to. . . Now when I signed this note, that's right, I told my mother about it. As to whether or not my mother agreed, that she owed Roy, on September 20, 1949, $2843.75—well, that's right. As to whether she didn't claim that Roy owed her anything or she wouldn't have authorized me to sign this note, would she— well, she said he ought to be reimbursed. When she authorized me to sign this note, as to whether or not she told me that she owed Roy this amount of money—well, she thought Roy ought to be reimbursed. Yes, she told me she owed Roy this much money. As to whether or not she admitted she owed Roy when I signed this note—well, that's right." Harley Wheeler, being authorized to do so by his mother, executed the note above referred to for $2843.75, and it was delivered to Roy Wheeler. On being recalled to the stand Harley Wheeler testified that his mother, Mrs. Wheeler, wanted Roy Wheeler to be paid. "She wanted to acknowledge payment of his expenses and for him to be reimbursed. In other words, Mrs. Wheeler, on September 20, 1949, felt like she owed Roy $2843.33—well, yes. As to whether or not I say that is the reason this note was signed— well, she felt like she owed Roy at that time that amount of money; that's right, she wanted him to be reimbursed." Roy Wheeler was sworn for the purpose of cross-examination and testified: "As to whether or not was a note given to me for $2843 and something for bills that I had paid, by my mother— well, that is right. As to whether that note was given to me in complete satisfaction of any claims that she might have had against me for damages by reason of that, was that a complete settlement of that or is that just payment of those bills—well, it was just in payment of the bills up to that time, that we thought was incurred at that time. That's right, up to that

time. As to whether my mother had no money and I just advanced the money and took the note—well, that's correct, yes sir. Yes, sir, that's what it was for."

The bills were made to Roy Wheeler and paid by him and the checks given by Roy Wheeler in payment thereof were admissible along with the evidence quoted above, so that the jury might determine whether the items or bills were a part of the necessary expenses as a result of the injuries sustained and as evidence of their value, and therefore some evidence of the extent of her damage. The note which was given by the mother, along with the evidence of Roy Wheeler that the items enumerated were necessary expenses which were paid for by Roy, was allowable along with the other evidence tending to show that these payments were made merely as advances to his mother, and that she gave the note and he accepted it as evidence of the debt which his mother owed him, and such advances, the amount and value of which were covered by the note, and not in full settlement for all items of damage such as pain and suffering and all future damage such as might develop, as bills for nursing, medicine, doctors' bills, etc. We therefore think that the court did not err in allowing these itemized bills, checks, and the note in evidence.

Irrespective of any damages that the mother might have recovered against Roy Wheeler, she or her estate still owed Roy the amount of the note, $2843.75, which bore interest at the rate of 7 percent, and would be liable therefor. To illustrate, if her recovery against Roy had been for only $1000, and she had applied this amount on the note, Roy still could have recovered from his mother the difference between the amount of the note and the amount of the verdict. Thus, in the instant case, the verdict being for $4858.54, if the executor should credit Roy's note with $2845.75, together with interest, then Roy would only have to pay the executor the difference between the amount of the verdict and the amount of the note. We do not think that the payments of the expenses, incurred as a result of the injury in question by Roy Wheeler, and the acceptance by him of the note for these advances, constituted a voluntary payment. We think that the mother's estate is still under the obligation to pay Roy Wheeler this note, irrespective of whatever the verdict in the damage suit case might be.

The authorities cited by the plaintiff in error (*McCarthy* v. *Mobley*, 14 *Ga. App.* 225 (3), 80 S. E. 523; *Giles* v. *Smith*, 80 *Ga. App.* 540, 56 S. E. 2d, 860; *Collier* v. *Casey*, 59 *Ga. App.* 627, 1 S. E. 2d, 776) are distinguished by their facts from the case at bar, and the principles therein enunciated are not applicable here.

■ The court, after having charged the jury as to when the plaintiff would be entitled to recover on the case as made, then gave the following charge as to the items or elements of damage alleged in the petition with reference to hospital bills, medical bills and expenses, and nurses' bills: "I charge you, gentlemen, that the plaintiff in this case is suing for hospital bills, doctor's bills, medical bills, and nurses' bills; and if you find that the plaintiff is entitled to recover against the defendant, those are all items for which you would be authorized to write a verdict, if you find that the defendant is liable to the plaintiff."

Under the evidence in this case, we do not think this excerpt from the charge was reversible error.

■ On the occasion in question, Howard Booker, the grandson of the deceased, was at home. His grandmother, who lived with him, had started to church with her son, Roy Wheeler, who lived in sight of their home just north of it about six hundred yards, on the same road. On the occasion in question, Booker saw the lights of Roy Wheeler's automobile when Roy left his home. It was then about eight o'clock in the evening. In traveling from his house to the house where Rebecca Wheeler lived with her grandson, it was necessary for Roy Wheeler to go south about six hundred yards on a main road, then turn left to the east and enter the driveway that leads to the home of Mrs. Wheeler, which house is set back a distance of about 275 or 280 feet from the main road. When Roy turned left into the driveway he struck his mother about 25 or 30 feet from the main road, at, on, or near the right side of the driveway approaching Mrs. Wheeler's home. Concerning this Howard Booker testified as follows: "As to whether or not when Roy would come to get Mrs. Wheeler to take her anywhere, he would come, always come to the house to get her, wouldn't he—well, not every time. As to whether I ever knew her to go off down the road and meet him at night—well, yes, yes, sir, at night. I've walked

down there with her on several occasions when he picked her up, and a lot of times he would drive up to the house after her. As to whether I would stay there with her until Roy got there—well, I have, yes, sir. But on this night she went out without me or my wife or anyone else and walked off down in the darkness down towards the road—yes, sir. As to whether I have never known of her going down there by herself at night to meet Roy—well, I saw her go down there on lots of—a number of occasions they picked her up at the road there, at night. As to whether, when she did that, didn't she walk on down to the road—well, yes, sir, she'd meet them down at the main road. Yes, sir, meet them down at the road. . . Down at the road and driveway where Mr. Wheeler turned in at, as to whether or not there was any obstruction, trees, or billboards or anything that would obstruct the view—well, no, sir. Yes, sir, there was a clear space where he turned in. Nothing to prevent anyone from seeing a person standing there in the drive."

Howard Booker also in effect testified that there is a sharp turn into the driveway of his mother's home, but the lights of an automobile in shining down the driveway when you turn in from the north, as Roy Wheeler did, would have necessarily lit up the south side of the driveway first, that is, the side on which Mrs. Wheeler was standing when she was hit. Howard Booker also testified that he almost immediately went to the scene of the occurrence. "Roy Wheeler was there. As to what did he say, if anything, to me, well, we got her [Mrs. Wheeler] up and carried her to my house and he [Roy Wheeler] up and carried her to my house and he [Roy Wheeler] says, 'I just turned in here—I didn't see her—I just hit her—I didn't see her.' That's all he said."

Under the evidence, Mrs. Wheeler on many occasions met her son Roy, the defendant in this case, at the road, and he was fully aware of her age and infirmities and lack of agility to avoid being hit by his automobile. He knew that sometimes she met him at the road, and the jury were authorized to find that in the exercise of ordinary care he should have anticipated that she might be at the driveway at the spot where she was, and we cannot say that the jury were not authorized to find that he was guilty of actionable negligence.

840

The exceptions to the judgments of the trial court, overruling the demurrers, and subsequently overruling the motion for a new trial as amended, are without merit.

Authorities cited by the plaintiff in error, other than those referred to in the opinion, are: *Head* v. *Bridges,* 67 *Ga.* 227; *Jones* v. *Smith,* 120 *Ga.* 642; Code, §§ 24-2104, 24-1901, 24-2101, 24-2105, 24-2109, 113-1207, 113-1501, 113-1504, 113-2306, 113-1227, 113-2201, 20-1205, 20-1201; *Bell* v. *Love,* 72 *Ga.* 125; *Stewart* v. *Patterson,* 152 *Ga.* 754; *Hoke* v. *Atlanta,* 107 *Ga.* 416; *Williams* v. *Stewart,* 115 *Ga.* 864; *Mallory* v. *Royston National Bank,* 135 *Ga.* 702; *Moore* v. *Seaboard Air Line Ry. Co.,* 30 *Ga. App.* 466 (11); *Christian* v. *Smith,* 78 *Ga. App.* 603; *Folds* v. *Folds,* 187 *Ga.* 463; *Heller* v. *Samuel Silver Inc.,* 30 *Ga. App.* 488; *Pattison* v. *Albany Building and Loan Ass'n.,* 63 *Ga.* 374.

Cited by the defendant in error, are: *A. C. L. R. Co.* v. *Jones,* 132 *Ga.* 196; *Central of Georgia Power Co.* v. *Cornwell,* 139 *Ga.* 1; *McLendon* v. *Johnson,* 71 *Ga. App.* 424; *Richter* v. *Atlantic Co.,* 65 *Ga. App.* 605; *Morrow* v. *Southeastern Stages,* 68 *Ga. App.* 146; *Head* v. *Bridges,* supra; *Richardson* v. *Seibert,* 38 *Ga. App.* 76; *Scott* v. *Imperial Hotel Co.,* 75 *Ga. App.* 91; Code, §§ 113-601, 113-610, 113-1227, 113-1228, 24-2104, 20-1201.

*Judgment on the main bill affirmed; cross-bill dismissed. Gardner and Townsend, JJ., concur.*